WILLIAM F. DUFF & another *vs.* MARY LEARY.

Suffolk.　March 3, 1888. — April 7, 1888.

Present: MORTON, C. J., FIELD, DEVENS, W. ALLEN, C. ALLEN, HOLMES, & KNOWLTON, JJ.

*Adverse Possession — Evidence — Declarations.*

Evidence that a tenant, a single woman, in a writ of entry took possession of the demanded premises under an alleged verbal gift from an uncle and occupied them for twenty years, but "never did anything without consulting him" during that period; that she told her friends that she was the owner of the premises; that she let a portion, with her uncle's approval, and collected the rent thereof; that, as she testified, "as regards the tenants, to them I always acted as owner"; that the members of her father's family, who lived with her for much of the time, paid her no rent; that she did "papering or whitewashing, or something like that," to the premises; that her uncle paid the family expenses before and during the twenty years till he died; that he paid for insurance, water rates, repairs, and the taxes, which were assessed to him, as afterwards to his heirs; and that sisters of her uncle, who acknowledged his ownership, occupied part of the premises rent free before and after the tenant took possession, one of whom, as his agent, collected rents of certain tenants, contracted for repairs, and paid therefor with money furnished by him, will not authorize a finding that the tenant acquired a title by adverse possession.

Declarations of an alleged donor of land thereafter as to his ownership, and how the donee occupied it, and his entry of it in an inventory of his property, are incompetent on the questions whether there was a gift, and whether the donee held it by adverse possession.

WRIT OF ENTRY, dated May 29, 1884, to recover a parcel of land on Oak Street in Boston. Plea, *nul disseisin.* The action was brought in accordance with the decision in *Leary* v. *Duff,* 137 Mass. 147, and trial was had in the Superior Court, before *Thompson,* J., who allowed a bill of exceptions, in substance as follows.

It appeared that one John Duff, the father of the demandants and the uncle of the tenant, on April 30, 1859, bought the demanded premises subject to a mortgage which he assumed and agreed to pay; that on May 2, 1864, he paid off the mortgage, which was duly discharged of record; that he died on October 6, 1880, leaving a will, in which no specific devise was made of any real estate, but the residue of his property, real, personal, and mixed, was devised in equal portions to his three children, the demandants and John R. Duff; that at the date of the

will the testator owned real estate besides the demanded premises; that on April 17, 1882, John R. Duff conveyed his undivided interest in the demanded premises to the demandant William F. Duff; that from the time John Duff purchased the demanded premises, two of his sisters, Mary Duff and Mrs. Hannah E. Manning, a widow, occupied the house thereon free of rent till the spring of 1860; that the tenant, who was fifty-six years old, was the daughter of Catherine Leary, another sister of John Duff; that there had been some estrangement between her uncle and mother, and that the tenant had not spoken to her uncle for twenty years prior to 1860, except once in 1856 or 1857 on the street; that the demandants claimed title as tenants in common of the demanded premises under the residuary devise in the will; and that the tenant claimed title under a verbal gift to her, made in May or June, 1860, by John Duff, of the demanded premises, of which she had had the open, continuous, and exclusive possession ever since.

The tenant testified as follows: " I first saw my uncle at my aunt's, Mrs. Manning's, at No. 41 Oak Street, in March or April, 1860. Miss Mary Duff had left, and Mrs. Manning was about going. He came in to see my aunt. I was visiting her. He said he would like to do something for me; asked about the affairs of the family, about my mother, said he had not seen the family for twenty years. I told him about the family, my father being aged. He asked me about my work, how much I earned, how I got along. I told him in the seasons, fall and spring, I could do very well, the hardest thing I found to do was to pay the rent. He said he would like to do something for me, and he said, ' If you will stop your work now, and get you a house of suitable character, and tell me the price, I will look at it, and buy it for you.' He told me to go the next day and begin to look for a house, and remain with my aunt, and he would pay me the same wages each week as if I was at work in the shop; told me to remain with my aunt until she broke up housekeeping, as she would be lonely. I remained until she moved away. My brother and I helped her move, and the house was shut up. There was a house on Middlesex Street that was for sale, and he asked me to go into it on trial. I moved into it, and paid the rent in advance. I remained about

four weeks, and I went to see him, met him at the Providence Depot, and told him I did not like the house. He says, 'I will give you a house on Ball Street.' He told me to go and see the owner, he was on the premises. I asked the owner how much one of those houses was. He named the price; I forget what the price was. I went and told my uncle, who was on the street waiting for me. He said, 'Go back, and tell the owner that you want to buy the house if he will give it to you for $200 less than what he asks for it.' I went back and saw the owner, and he would not come to the terms. I went back to my uncle, who was waiting for me, and told him, and he said we had better take the cars and go down to Oak Street. We went down to Oak Street, and he sent me over to the corner grocery to get the key, and we went into the house and looked it over. He said he was to meet my aunt there in Oak Street, and the time was drawing near when he had to meet his train at one o'clock. As we were going out, we met my aunt. He said he could not stay but a few minutes, but would see her in a few days; that he was glad she came out; that he had given me the house, given it to me as mine, and he wanted me to be the sole owner of that house. He then asked me which house I would like best, the one on Ball Street or the present house. I preferred that in Oak Street, being in the central part of the city, and I told him so. He said, 'You take this house, I will make it a present, and give it to you, and you consider yourself the sole owner of it, as a present; you can tell your folks so.' It was after that that Mrs. Manning came, just as we were going out. He had not time to say much to her, only he had given me the house, made me a present of it. She said she hoped I would like it better, and stay in it longer than she did. He asked me when I should move. I told him that day. He said he would come in to the house, then, in Oak Street, the next day. I went and got a teamster, and hired a woman, and moved in that afternoon, and prepared for the family that afternoon, as soon as I could. All got in that evening. He came as he promised, the next day, at a quarter of eleven, and asked me if he could see my mother, he had not seen her for many years, and should not know her. I went upstairs, and told her that uncle wanted to see her. She was very much embarrassed, but she came down. I introduced

them, and she thanked him for the house, said she could not find words to express herself. He said he had given the house to me, and asked if she would look upon it as my being the sole owner, as I was to take care of my father and mother. She said she would, with tears in her eyes, and she did, until the day she died, look up to me as the owner. My mother died on June 22, 1878, aged seventy-nine years. My father died in October, 1879, aged ninety-three years."

The tenant testified further, that she paid no taxes on the demanded premises; that as to repairs "she did a little papering, whitewashing, or something like that, each fall and spring, in regard to spring cleaning and so forth"; that her uncle "always furnished money for the house, especially at Christmas or Thanksgiving, giving me liberally quite large sums"; that he always paid the grocery and other bills; and that Mrs. Manning came back to live in the house on Oak Street in 1870 or 1871, in regard to whose return her testimony was as follows: " She was visiting us, and told me she had a room in Chester Park, paid a week in advance, and felt sad and lonely to go there. I asked her why could not she come there and take a room. She said she did not know whether my uncle would like it or not. I told her I would meet him, and I went and met him next day, on Temple Place. I told him I was glad to meet him, because I wanted a little business with him. I asked him about my aunt, told him she had left Mr. Willard's, and would like a room there. He did n't seem to approve of it. He said, ' I don't think you had better have her, as she would not continue there when I put her there years ago.' I said it was bad for her to go alone, she was under the doctor's care, and I asked him if he would not let me have her as my tenant, and perhaps I would be different from what my Aunt Mary was. I told her the house was out of repair, and she must put on her own repairs if she came there. She said she would do so if Mr. Duff did n't object to her coming in."

On cross-examination the tenant was asked as to her acts of ownership on the demanded premises, and testified that she lived there and " as regards the tenants, to them I always acted as owner "; that she " collected rents of the tenants "; that Mrs. Manning collected rents, but " not of all the tenants, only

one or two"; that she told everybody that she "owned the house,—everybody thought I owned the house,—friends of mine, who knew I never had money enough to buy the house"; and that "I did and acted according to my uncle's wishes. If there was anything to be done, he always told me to act as the owner. I do not know as there is anything particularly in the ownership, only claiming the rent and calling it my house, accepting it as a gift. I considered I was the owner by my uncle giving me the title of ownership. I never did anything without consulting him during those twenty years."

Mrs. Symonds, a sister of the tenant, testified, for the tenant, that John Duff told her, as late as 1876, that he had given the house to the tenant, her conversation with John Duff being as follows: "I told him that my sister said that he gave her the house as a present, and that my aunt found a great deal of fault with her, and said she did not believe it. He said Mary was correct, that he did give her the house, and that he told her that he wanted every one to know that the house belonged to her. I told him that my father asked her why she did not have it in black and white, in case anything should happen to Mr. Duff, and he said that was all settled. I asked him if his son John R. Duff knew about the house, and who lived in it. He said he did, and if he died that night that it could be settled just the same as if he was living."

The brother of the tenant testified for her that John Duff told him, in 1861, he had given the house to the tenant.

One Richardson, called by the tenant, testified that his family and himself occupied rooms in the house from 1870 to 1874; that Mrs. Manning was in the house during a part of the time; that he hired his rooms of the tenant and paid rent to her; and that on one occasion, desiring some repairs to be made, he spoke to the tenant, and the repairs were made immediately.

It appeared that John Duff paid the rent of the house on Middlesex Street, for the month previous to the tenant's moving into the house on Oak Street; that, soon after the tenant and her family moved into the house on Oak Street, Mary Duff came back and lived there six or eight years, till she died, in 1868; that Mrs. Manning came there in 1870 or 1871, and lived there till she died, on April 8, 1882, occupying exclusively two or

three rooms; that the tenant's brother as well as her father and mother always lived there, except for about four years, and her sister lived there till after November, 1883, none of these relatives ever paying to the tenant any rent; that the tenant let a small portion of the house to Richardson for three or four years, and collected and received the rent therefor; and that John Duff knew of and consented to such letting, she consulting him about it, and about the occupancy of the house.

It also appeared, or was admitted, that the taxes on the premises were regularly assessed to John Duff, from 1859 to his death, and paid by him, and since his death to his heirs, and paid by them; that John Duff kept the house insured against fire in his own name; that he paid the water rates for the house, and made or paid for all the repairs on it; that Mrs. Manning, every year, from 1870 to her death, while she occupied two or three rooms, as above stated, collected rents of one or two tenants, ordered and contracted for most of the repairs on the house, directed how the same should be made, and paid for the same, the bills for such repairs being made to her and in her name, though John Duff furnished the money, or gave her the amounts she paid for such repairs, and that the bills were given to him, and that she did not pay rent for her rooms.

The demandants introduced in evidence, as a declaration of a person occupying a part of the premises, the following letter: "Boston, January 19, 1881. John R. Duff, Esq. Dear Sir: I enclose with this the water tax for 1881 of the house No. 85 Oak Street, in which I am living. This house, as you are doubtless aware, belongs to the estate of your late father. He purchased it many years ago and gave the free use of it to me and my sister, intending, as he said, that we should remain in it during our lives should we feel so inclined. It was his custom, also, to pay all the bills on the estate, and to allow us what was necessary for our support. It would be a relief to me if you would be kind enough to let me know whether you propose to continue your father's kindness to us, or what disposition you propose to make of the estate in which we now live. I should not trouble you were it not necessary that I should know what lays before me in the immediate future. I am yours, very respectfully, Hannah E. Manning, No. 85 Oak Street."

The demandants contended that John Duff allowed his sisters and relatives to live in the house on Oak Street free of rent, and paid the taxes, water rates, repairs, and furnished them money for the purpose of assisting them, and in that way gave them the use of the house; and offered evidence to prove that John Duff, at different times between 1860 and his death, made statements and declarations as to his ownership of the house, and as to how his relatives occupied it, inconsistent with the alleged gift and claim of the tenant; but the judge ruled that the evidence was not admissible for any purpose, and excluded it, it not appearing that the declarations were made on the premises, or in the year of the alleged gift, or in the presence of the tenant. The demandants also offered in evidence an inventory, which was excluded, of the estate of John Duff, made by him on April 1, 1866, in which appeared the entry, " House, 41 Oak Street."

The demandants, among other requests not material, asked the judge to rule: " That there is no evidence that will justify the jury in finding that Mary Leary had disseised John Duff, or obtained a title good against the demandants."

The judge declined so to rule, but gave other instructions, under which the jury returned a verdict for the tenant; and the demandants alleged exceptions. The case was submitted on briefs to all the judges.

*A. Hemenway & C. G. Keyes*, for the demandants.

*S. J. Thomas & J. A. Maxwell*, for the tenant.

KNOWLTON, J. The dwelling-house which constitutes the demanded premises became the property of John Duff by a deed dated April 30, 1859. He died on October 26, 1880, and the demandants are two of his children, who hold, under his will and by a deed from their brother John R. Duff, the title which he had at the time of his death. They are entitled to recover, unless the tenant has acquired a title by adverse possession.

The tenant testified, and introduced to corroborate her the testimony of her brother and sister, that John Duff, who was her mother's brother, made to her a verbal gift of the demanded premises in the spring of 1860, and that she, and her father and mother and brother and sister, immediately moved into the house, and that she has been in occupation as owner ever since. If the

gift was made as she testifies, it was ineffectual to change the ownership of the property. She therefore rests her claim of title upon an alleged disseisin and adverse possession. The principal question before us is whether there was evidence to warrant the jury in finding in her favor upon this claim. The evidence in relation to the gift is immaterial, except as it bears upon the character of her occupation. Both parties must be presumed to have known that the legal title remained in John Duff, and her subsequent acts must be scrutinized, to see whether they constituted actual, open, exclusive, and adverse possession of the real estate for twenty years or more. *Sumner* v. *Stevens*, 6 Met. 337. *Motte* v. *Alger*, 15 Gray, 322.

In the language of the bill of exceptions, "It appeared, or was admitted, that the taxes on the premises were regularly assessed to John Duff from 1859 to his death, and paid by him, and since his death to his heirs, and paid by them; that John Duff kept the house insured against fire in his own name; that he paid the water rates for the house, and made or paid for all the repairs on it; that Mrs. Manning, every year from 1870 to her death, while she occupied two or three rooms, as above stated, collected rents of one or two tenants, ordered or contracted for most of the repairs on the house, directed how the same should be made, and paid for the same, the bills for such repairs being made to her and in her name, though John Duff furnished the money, or gave her the amounts she paid for such repairs, and that the bills were given to him, and that she did not pay rent for her rooms."

The failure on the part of the tenant ever to claim recognition, either as owner or possessor, in regard to the taxation of the property, or the insurance of the house, or the charging of water rates, was hardly consistent with an exclusive possession adverse to the true owner. In making or paying for all the repairs, he, and not she, performed acts of control and management appropriate to possession as well as to ownership. From 1870 to her death in 1882, Mrs. Manning, a sister of John Duff, was in possession of a part of this house. It is evident that her occupation was not under the tenant, for she not only paid no rent, and collected rents all the time of one or two other tenants, but she acted apparently as agent and manager for the owner, in.

ordering most of the repairs on the house, directing how they should be made, paying for them, and giving the bills to John Duff, and receiving from him the amounts which she paid. Her letter, introduced as an accompanying declaration characterizing her occupation, is confirmatory evidence that her possession was under her brother, and not under the tenant. And the same fact appears in the testimony of the tenant, that, when Mrs. Manning was spoken to in 1870 or 1871 about coming back there to live, she was in doubt whether her brother would like it or not, and finally came only after the tenant had obtained his consent, and she was told that he did not object to it.

The acts on which the tenant relies to establish her title are her occupation, and doing " papering or whitewashing, or something like that," and her telling her friends that she was the owner, and her collection of certain rents. She was examined fully and particularly as to her acts of possession, and her general statement that she acted as owner must be taken to mean merely that she acted in the ways specified. *Richmond Iron Works* v. *Wadhams*, 142 Mass. 569, 570. But it is conceded that her occupation was with her father's family, that her brother lived there all the time except about four years, her sister until after November, 1883, her mother until she died in 1878, and her father until he died in 1879, and that none of them ever paid any rent. It is conceded also, that John Duff paid rent for the house where they all lived immediately before moving into this ; and that his sisters Mary Duff and Mrs. Manning had occupied this house without charge for rent from the time he bought it until just before the alleged gift to the tenant, and that, soon after, Mary Duff came back into the house and lived there without paying rent until she died, in 1868; and that Mrs. Manning was there from 1870 or 1871 until she died, in 1882. As bearing upon the character of her occupation, it also appeared from the tenant's testimony that her uncle always furnished her money for the house, and paid the grocery and other bills, giving her liberally quite large sums. As to the occupation of the only tenant with whom there was evidence that she ever made an arrangement, it appeared that she consulted her uncle, and that he consented to the letting. In another part of her testimony, she said, " I never did anything without consult-

ing him during those twenty years." A mortgage, put upon the property before he bought it, was paid by John Duff, and was discharged of record, in May, 1864. Upon the undisputed facts and the tenant's own testimony, it is difficult to see where there was any evidence that she maintained for twenty years a possession, either exclusive, or adverse to the true owner. We think the jury were not warranted in finding that she acquired a title, and the first instruction requested should have been given.

The evidence of declarations of John Duff, made at sundry times, as to his ownership of the house, and how his relatives occupied it, and of his entry of it in the inventory of property belonging to him on April 1, 1866, was rightly excluded. As declarations in his own favor, they were not competent upon the question whether there was a gift, and they had no relation to the alleged acts of possession upon which the tenant rested her case.                                    *Exceptions sustained.*